**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MURLEANA STACKHOUSE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 05-1069 (JR) |
| | : |
| JO ANNE B. BARNHART, | : |
| Commissioner, Social Security | : |
| Administration, | : |
| | : |
| Defendant. | : |

**MEMORANDUM**

Plaintiff Murleana Stackhouse seeks judicial review and reversal of a final decision of the Commissioner of the Social Security Administration denying her Supplemental Security Income disability benefits. Before the court are plaintiff's motion for summary judgment [7], and defendant's motion for a judgment of affirmance [10]. For the reasons discussed below, the defendant's motion will be **denied;** the plaintiff's motion will be **granted**.

1. **Background**

   A. Fibromyalgia

According to the National Institute of Arthritis and Musculoskeletal and Skin Diseases at the National Institutes of Health, fibromyalgia syndrome is a "common and chronic disorder characterized by widespread muscle pain, fatigue, and multiple

tender points." [7-2] at 4.[1]  Fibromyalgia may also be characterized by sleep disturbance, morning stiffness, headaches, irritable bowel syndrome, numbness or tingling of the extremities, and cognitive and memory problems.  Id. at 5.

Fibromyalgia is not a disease, but rather a syndrome that is marked by signs and symptoms.  It cannot be diagnosed using objective methods, but a physician may diagnose fibromyalgia if a patient experiences pain with the application of four kilograms of pressure upon at least 11 of 18 paired tender points (i.e. 11 of 36) on the body that have been identified by the American College of Rheumatology.  [7-2] at 5 (citing "Questions and Answers about Fibromyalgia").

There are no medications available to treat fibromyalgia, but doctors prescribe pain-killers, anti-inflammatory medication, and anti-depressants to treat its symptoms.  One drug used to treat the pain aspect of fibromyalgia is Oxycontin, a potent opioid-based Schedule II drug for moderate to severe pain.  [7-2] at 6.[2]  Used alone, it can cause tiredness; when combined with other pain relievers or antihistamines, it can cause severe or "dangerous" drowsiness.  [7-2] at 6.[3]

---

[1]  See "Questions and Answers About Fibromylagia," http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm.

[2]  See "FDA Strengthens Warnings for Oxycontin," http://www.fda.gov/bbs/topics/ANSWERS/2001/ANS01091.html.

[3]  See http://www.drugs.com/oxycontin.html.

B.  Plaintiff's relevant medical history

Ms. Stackhouse was born in 1959; at the time of her November 2003 hearing, she was 44 years old. [10] at 5. She suffers from fibromyalgia, lumbar and cervical disc disease, lumbar and cervical disc disease radiculopathy, right shoulder disorder, bilateral carpal tunnel syndrome and bronchial asthma. [7-2] at 4.

Ms. Stackhouse first reported significant pain in 1997, when she was admitted to the hospital with chest pains. [10] at 6. She was diagnosed with an upper respiratory infection and "atypical chest pain." Id. at 6. After a serious fall in February 1998, she began experiencing constant pain. Dkt. #5 at 452. In September 1998, she sought treatment for neck pain that radiated into the right arm. [10] at 6. An MRI taken at the time was normal, as were the plaintiff's x-rays, though the doctor noted there were some mild spinal abnormalities. Id.

In February 1999, Ms. Stackhouse again reported to the local hospital that she was experiencing neck pain that radiated into her right arm. She indicated that she had been in pain for eight months. [10] at 6. EMG testing again indicated some mild abnormalities. Over the next few months, plaintiff underwent therapy, but she had essentially the same symptoms and pain. Id. at 7.

In April 1999, plaintiff began seeing Dr. Hampton J. Jackson.  He ordered lab testing in April 1999 that ruled out rheumatoid arthritis and some other possible causes for Ms. Stackhouse's pain.  A myelogram with CT scan was also normal. [10] at 8.  However, Dr. Jackson did find that Ms. Stackhouse had significant trigger points for her pain in her upper trapezius muscle, and administered a paraspinal block injection to help alleviate pain.  Id.

By January 2000, plaintiff was taking Oxycontin regularly for pain.  [10] at 8.  In February 2000, Dr. Jackson found that she had increased symptoms, and he increased her medication as well as administering a facet block injection to alleviate pain. Ms. Stackhouse experienced some relief.  [10] at 9.

By May of 2000, at least one of Ms. Stackhouse's multiple physicians, Dr. Palmer, had diagnosed her with fibromyalgia.  [5] at 552-53; [10] at 13.  In June and August 2000, Ms. Stackhouse symptoms worsened again, and Dr. Jackson indicated that her condition made her unfit for any work.  [10] at 9.  After a brief respite, by October 2000, her condition had worsened yet again. Id. at 10.  A November 2002 MRI, however, was normal.  A third physician, Dr. T.K. Asadi, treated the plaintiff in November 2000 and January 2001.  In November 2000, Dr. Asadi found that plaintiff had full muscle strength, a normal gait and stance, and a limited cervical and lumbar spine range of motion.  By January,

Ms. Stackhouse had regained a full range of cervical and lumbar spine motion.  [10] at 11.

In October 2001, a fourth physician -- Dr. Potter, a rheumatologist -- separately diagnosed the plaintiff with fibromyalgia.  [10] at 11.  That month, he indicated that she was unable to work, and that her pain had been unresponsive to treatment.  [10] at 11.  In December 2001, Dr. Jackson agreed, indicating in a letter that plaintiff's fibromyalgia, among her other conditions, prevented her from working.  [10] at 11-12.

When Ms. Stackhouse returned to Dr. Asadi in February 2002, she had multiple tender points, all over.  Dr. Asadi continued treatment, with medication, through March, June, and August of 2002.  He could find no organic reason for her continuing pain.  At each visit, she had full muscle strength, a normal gait, and a full range of cervical and lumbar motion.  [10] at 12.  His reports, however, -- dating from November 2000 to September 2002 -- all contain diagrams indicating that Ms. Stackhouse had 19 to 20 tender points, all over her body.  A diagram, prepared by Dr. Potter on February 5, 2002, represented only the front of Ms. Stackhouse, but indicated nine tender points.  Dr. Palmer's March 7, 2003 letter further states that Ms. Stackhouse's "musculoskeletal examination was significant for tender points." [7-2] at 5.

There is now consensus among the physicians that Ms. Stackhouse has fibromyalgia, among other conditions. Although the records reflect periods of improvement, they have been very brief and plaintiff's conditions continue to cause her substantial, effectively unremitting, pain. At nearly every visit to her treating physicians, she has reported back, neck, arm, or shoulder pain, as well as numbness and sleep difficulties. [7-2] at 5. Her pain level is a nine out of ten both morning and afternoon, and she has difficulty engaging in all activities of daily living. [7-2] at 7. She cannot lift ten pounds frequently or occasionally, has significant limitations in her gross and fine motor skills, can only walk or stand for two or three minutes at a time, requires a sit/stand option (at will), and cannot be employed in a position requiring good vision. [7-2] at 4. She takes Oxycontin for her pain, and several other drugs to help relieve her lumbar and cervical radiculopathy, bronchial asthma, allergies, gastroesophageal reflux disease, and migraines. [7-2] at 6-7. She uses a cane to assist her when walking any distance. [5] at 198. A three block walk takes her at least 20 to 25 minutes, because she must stop frequently to relieve her pain. She needs assistance dressing, cooks infrequently, and requires her children's help with grocery shopping and laundry. [7-2] at 9. She has difficulty writing, and can only write her name before experiencing pain. [7-2] at

10.  Her condition also prevents her from leaving her home to visit people or attend religious services, and she has no hobbies.  [7-2] at 16.

   C.   Plaintiff's employment history

Ms. Stackhouse has a tenth grade education.  [7-2].  Prior to developing her current health problems, she was employed, at various times, as a clothing store clerk, a teacher's assistant, and child care worker.  [10] at 5.  At one of the administrative hearings, Ms. Stackhouse testified that her last form of employment was providing some modest baby-sitting services, for about two hours a day.  [5] at 193.  The children were all school-aged, and she did not prepare meals for them, dress them, or drive them anywhere.  Her only responsibility was to watch them do their homework for two hours a day.  Id.  She fell asleep, however, four out of every five days the children were in her home, and, after a year, discontinued the babysitting because she felt she could not properly monitor the children.  [5] at 206-207.  She has been unemployed since that time.  At both her 2001 and 2003 administrative hearings, vocational experts testified that, if her testimony about her condition was credible, there were no jobs she could perform.  [5] at 180; id. at 216.

D.   Procedural History

Ms. Stackhouse applied for Supplemental Social Security Income (SSI) on April 27, 2000, and was denied benefits on August 1, 2000.  [7-2] at 2.  On April 26, 2001, she requested a hearing before an Administrative Law Judge (ALJ); the hearing was held on October 31, 2001.  Id.  On April 22, 2002, the ALJ denied Ms. Stackhouse's claim.  She filed a timely appeal with the Social Security Administration's (SSA) Appeals Council, which remanded the case to the ALJ for consideration of Ms. Stackhouse's fibromyalgia and a more detailed explanation of how Ms. Stackhouse's subjective complaints were inconsistent with her demeanor and physical activity.  [7-2] at 2-3.  On May 8, 2003, the ALJ held another hearing and, on November 7, 2003, again rejected plaintiff's claim.  Ms. Stackhouse requested another review from the Appeals Council; the request was denied on February 26, 2005.  The Council stated that, should Ms. Stackhouse file a civil action, the ALJ's decision of November 7, 2003, would serve as the Commissioner of Social Security's final decision.  Ms. Stackhouse timely filed this action on May 27, 2005.  [7-2] at 3.

2.   **Analysis**

A.   Standard of Review

The Social Security Act defines disability as the inability

- 8 -

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of less than 12 months.

42 U.S.C. § 1382c(a)(3)(A).  The Social Security Administration (SSA) employs a five-step, sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R. § 404.1520.

> The claimant bears the burden of proving: first, that he is not engaged in substantial gainful work...; second, that he has "severe" impairments, i.e., ones that "significantly limit" his ability "to do basic work activities"...; third, that he has one of the impairments listed in Appendix 1 ... for the requisite duration ... and fourth, that his impairment prevents him from engaging in past relevant work.... If the claimant survives each of these steps, the Secretary has the burden of proving that given a claimant's age, education, work experience, and residual non-disability, he is still capable of doing work other than his past relevant work.

Stankiewicz v. Sullivan, 901 F.2d 131, 133 (D.C. Cir. 1990).  A court should reverse an adverse SSA decision below if it is unsupported by substantial evidence or tainted by errors of law.  42 U.S.C. § 405(g); Brown v. Bowen, 794 F.2d 703, 705 (D.C. Cir. 1986).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The test "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence."  Fla. Mun. Power Agency v. FERC, 315 F.3d 362, 365-66 (D.C. Cir. 2003), cert. denied, 124 S. Ct. 386 (2003).  The issue before the court is not whether Ms. Stackhouse is disabled, but whether the ALJ's

finding that she is not disabled is supported by substantial evidence and whether it is consistent with the appropriate legal standards.

   B.   The ALJ's decision

The ALJ found that Ms. Stackhouse had a limited education; that she had no transferable skills from any past relevant work; that she is unable to perform any of her past relevant work; and that her lumbar and cervical disc disease, cervical and lumbar radiculopathy, right shoulder disorder, bilateral carpal tunnel syndrome, fibromyalgia and asthma were all "severe" impairments. [5] at 143-44.  He also found that Ms. Stackhouse has limited residual functional capacity.

> The claimant can only lift less than 10 pounds frequently, and 10 pound occasionally, with similar pushing and pulling limitations in both the upper and lower extremities.  She can walk and/or stand for less than 2 hours in an 8 hour day, for 2 to 3 minutes at a time.  She requires a sit/stand option at will (discretion).  Her ability to balance, crouch and squat is occasionally limited, but she may never bend, stoop, kneel or crawl.  The claimant has a limited ability to reach and handle, but she can perform fingering (fine manipulation with hands, fingers).  She can occasionally perform feeling (skin receptors).  She has limited ability in doing any work requiring good vision.  The claimant has limited ability to hear.  She must avoid concentrated exposure to extremes in temperature, wetness, humidity, vibration, hazards, fumes, odors, dust, gases, and poor ventilation.

[5] at 144.

Despite these findings, however, the ALJ concluded that Ms. Stackhouse's impairments did not meet or medically equal one of the listed impairments in SSA Appendix 1; that her testimony

about her limitations was only partially credible; that under Medical-Vocation Rule 201.24 there were a significant number of jobs in the national economy that she could perform, and that, consequently, she was not, at any time, under a "disability" as defined in the Social Security Act.  [5] at 143-44.  These conclusions are based, in part, on the AlJ's finding that

> [t]he claimant ... baby-sits three school-aged children; walks them 3½ blocks to school in the morning, and picks them up around 5 p.m.  She makes sure they do their homework, and they leave around 6 p.m.  However it is unclear how much the claimant received in monetary payments for this work and what days she worked.

[5] at 143.

### C.   Application of legal standards

Ms. Stackhouse challenges the ALJ's November 7, 2003 decision on several grounds.  She alleges that the ALJ failed to give sufficient weight to the opinions of her treating physicians; that he ignored and misreported evidence favorable to her in finding her testimony only partially credible; that he did not consider her medications or their side effects; and that he ignored the appropriate findings of the vocational expert.

#### i.   Failure to give sufficient weight to treating physicians' opinions.

Under agency regulations, the opinion of a treating physician must be given "controlling weight" if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.

> [T]hese are likely to be the medical professionals most able to provide a detailed longitudinal picture of [applicant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2). Indeed, "when all of the factors are satisfied[] the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion." SSR 96-2p, Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *2 (SSA July 2, 1996).

The ALJ recognized, in his opinion, that Dr. Jackson -- Ms. Stackhouse's primary treating physician -- had concluded that Ms. Stackhouse's condition and limitations were permanent, which would preclude any gainful employment. [5] at 139, 664. However, the ALJ found Dr. Jackson's own comments contradictory, noting that Dr. Jackson had stated, in December 2002, that an MRI study was normal. [5] at 139. The ALJ also felt that Dr. Kimyal-Asaid's statement that there was "no organic reason for pain" contradicted Dr. Jackson's conclusions. Id. at 140. He thus gave Dr. Jackson's opinion, as treating physician, "limited probative weight," rather than controlling weight. Id.

Fibromyalgia, however, is a syndrome for which there is no diagnostic test. Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003). As explained above, it can only be diagnosed through the application of pressure to appropriate points on the body. Thus, the normal MRI and Dr. Kimyal-Asadi's statement that there is "no organic reason for pain" would both be completely consistent with a diagnosis of fibromyalgia.

> The ALJ effectively required "objective" evidence for a disease that eludes such measurement. As a general matter, "objective" findings are not required in order to find that an applicant is disabled... Moreover, a growing number of courts ... have recognized that fibromyalgia is a disabling impairment and that "there are no objective tests which can conclusively confirm the disease." Preston v. Sec. of Health and Human Servs., 854 F.2d 815, 818 (6th Cir. 1988); ... see also Harman v. Apfel, 211 F.3d 1172, 1179-80 (9th Cir. 2000); Kelley v. Callahan, 133 F.3d 583, 585 n.2 (8th Cir. 1998).

335 F. 3d at 108. Because Ms. Stackhouse claims debilitating pain from fibromyalgia, the MRI and Kimyal-Asadi statement cannot be used to discount Dr. Jackson's opinion, or provide substantial evidence to support a finding that she is not disabled. Dr. Jackson's opinion should have been given controlling weight in this case.

The ALJ also rejected the opinion of Ms. Stackhouse's other treating physician, Dr. Richard Palmer, that because Ms. Stackhouse's condition was not well controlled and he was uncertain whether she would improve in the future, Ms. Stackhouse could not maintain gainful employment and should be "favorably

considered for disability benefits." Dkt. #5 at 140, 656. The ALJ states that he presented the limitations listed by Dr. Palmer to a vocational expert, who listed several occupations available to Ms. Stackhouse. The ALJ thus found that "this does not confirm Dr. Palmer's conclusion of total disability." Id.

The ALJ decision to contradict Ms. Stackhouse's treating physician with a vocational expert's testimony in insupportable. As the Third Circuit has explained "[i]n choosing to reject the treating physicians an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Here, there is no medical evidence cited to contradict Dr. Palmer's findings except the evidence discussed above. Thus the ALJ should have given Palmer's opinion controlling weight.

>   ii.  <u>The ALJ misapplied the testimony of the vocational expert</u>.

At both hearings, the vocational experts testified that, if Ms. Stackhouse's statement of her condition was accurate, that she would be unable to perform any work. [5] at 180, 216. Finding Ms. Stackhouse only partly credible, however, the ALJ posed an improper hypothetical question to the vocational expert

and then improperly relied on the answer.  The hypothetical mentioned Ms. Stackhouse's age, education, past relevant work experience, and her residual functional capacity -- as the ALJ had determined it.  [5] at 142.  The question did not refer to Ms. Stackhouse's pain, frequent lengthy naps, attention deficit, lack of nighttime sleep, or headaches.  [7-2] at 25.  Responding to the hypothetical, the expert found that Ms. Stackhouse could perform no more than 5% of the 200 sedentary, unskilled occupations noticed by the Social Security Administration.  That response was the basis for the ALJ's holding that Ms. Stackhouse "is capable of making a successful adjustment to work that exists in significant numbers in the national economy" and found her "not disabled." [5] at 142-43.

In this circuit, "[i]f the ALJ looks to a vocational expert in assessing a claimant's ability to do other work, the ALJ 'must accurately describe the claimant's physical impairments in any question posed to the expert." Butler, 353 F.3d at 1005.  Any deficiencies in the description undermine the expert's conclusion that there are alternative jobs' that the claimant is capable of performing.  Id. at 1006.  Here, the ALJ failed to include important factors in the hypothetical, seriously undermining its accuracy, the expert's resultant conclusions, and the supposed substantial evidence in the record for a finding that Ms. Stackhouse is not disabled.

3.  **Conclusion**

The ALJ failed to give controlling weight to reliable treating physicians' statements, and incorrectly relied on the response to an incomplete hypothetical posed to a vocational expert, when he should have relied on Ms. Stackhouse's uncontradicted, actual testimony.  The ALJ's findings that led him to conclude that Ms. Stackhouse is not disabled are severely or completely undermined by the discussion above -- and I find there is not substantial evidence in the record to support his conclusion.  The administrative decision is reversed, and Ms. Stackhouse's benefits will be instated, retroactive to the date of her application.  An appropriate order accompanies this memorandum.


                                    JAMES ROBERTSON
                             United States District Judge